Steel & Wire v. United States  If I look at the 0.25 difference, I can see, well, that looks like it's going to be not significant. It looks like it is in line with 99% of the price variations that are probably going on in this condom. And when you take the weighted average, if you take the pool variance calculated by the weighted average, which ends up being 0.398, you can see, yes, this 0.25 is not significant, and it is consistent with what is going on in this condom. It is consistent with the pricing behavior of this condom. But when you take weight out of it, now we're just simple averaging these two standard deviations, and you have a pool variance of 0.28, this price difference of 0.25, which was clearly within the range of 99% of the sales of this condom, now suddenly is a significant price difference. And from that, I can see, to me, that looks completely inaccurate because it is not capturing what is actually happening within this condom. And commerce has an obligation to calculate the dumping margins as accurately as possible. And that extends throughout its calculations, including Cones D. And if commerce is trying to figure out, are the prices in this group, this test group, are they significantly different than the prices that are going on in the rest of the condom? If I'm not taking weight into account, I'm disassociating weight from price, which has a big impact on price, I'm getting an inaccurate picture of the prices in that condom. And that ends up sometimes, like in this example, triggering significant differences where, in reality, when you look at it objectively, that price difference is well within the range of price variations within that condom. So I see that I'm already into my... I think there's just one... The prices in several places in your brief, and maybe some of the other briefs, you say some number, 48 cents or $48 or something, per what? Are these also per kilogram? Yes, everything's per kilogram. Yeah, it wasn't stated. Okay, I apologize. Okay, thank you. And you've saved some rebuttal. Okay, thanks. Mr. Marshak, are you... Is there anything you need to tell us at the moment? Your Honor, I'd like to talk about what Mr. Gordon said he was talking about at the beginning. What happened here is the government has... I think you need to talk into the microphone so that we can recall what you have. I apologize. The issue came up what Mr. Gordon was talking about in the morning when we began. And the government has 15 minutes to reply to these two arguments. And the government, as it does in many, many cases, gave the party that was on its side seated five minutes of time for me to talk about affiliation. All right. Let me ask you, is there anything you need to tell us on the appeal in chief? On our argument? The Tolar issue. On the Tolar issue? Whatever it is that you're here for. I'm here to... I think Ms. Cote had something she wanted to add before we actually allow Mr. Marshak to address the merits. Okay. I would really, if Ms. Cote says everything, I have nothing to say. If Ms. Cote leaves something out, I have something to say. All right, we'll hear from Ms. Cotter. This has been highly unusual. We were advised by the court that each side would get 15 minutes... Let's just discuss the merits. Okay, thank you, Your Honor. We respectfully request that the court affirm the Court of International Trades' decision sustaining Commerce's final determinations both for affiliation and for its differential pricing methodology. I'll begin with affiliation. Midcontinent points to certain record evidence that it believes demonstrates control or the ability to control and or reliance. Commerce made a determination based upon substantial record evidence. Let me separate what I think are actually two points that were made. One is insufficient evidence for Commerce to find no affiliation. But the other is, completely putting aside sufficiency of the evidence, Commerce applied the wrong legal standard. So it simply didn't make the legally correct finding of inability to control. Can you at least maybe start with the legal aspect? Absolutely, Your Honor. Commerce utilized the proper standard just as the Court of International Trade did. When determining ability to control, the indicia for making that determination is identical to the indicia that one uses to make a determination about control. As Midcontinent argued, one is prospective and one is present. So ability to control is prospective, but we start with determining, ascertaining whether or not there's any actual control going on between protein and its tollers. Commerce made both determinations. The underlying, there is no current control, and there is no ability to control, which is the potential that the statute and the regulations and the SSA speak to. The ability to control, the potential to control, are the same. And the Issues and Decisions Memoranda is replete with references to the ability to control. So too is the trial court's decision here. Then turning to the evidence, what is the evidence for finding insufficient ability or no ability to control, notwithstanding some of the facts that show a kind of closeness of some of these? Sure, yes, Your Honor. The record demonstrated that there were at least 136 producers or exporters of nails in Taiwan. These would be the buyers from these companies. These would be the buyers, or companies that the tollers would supply to, yes. That eliminates any allegation of dependence on protein, because these tollers could seek to sell their services elsewhere to 136 other Taiwanese nail producers. Commerce explained that any appearance of closeness between protein and its unaffiliated tollers is the result also of the decentralized model or business model that protein had. Commerce found that there were no contracts or agreements between these unaffiliated tollers and protein. Commerce, again... I'm sorry, no contracts? No contracts or agreements. Were they selling to them? Yes, but there were no... Without a contract? Without contracts locking them into any future... Oh, without term limits, limiting contracts. Correct, yes, Your Honor. To determine whether a close supplier relationship exists, commerce examines whether a company may exercise control over another company such as the tollers here, protein and the tollers here, or may become reliant upon the controlling company, which would be protein here. The evaluation of actual control is as much the same as the evaluation of perspective or potential to control. Both evaluate, as I stated earlier, the exclusivity of business activities, absence of competitors with whom the allegedly controlled tollers could do business, and a host of contractual agreements that prevent the allegedly controlled company from conducting business outside of the parameters of its relationship with protein. So here, commerce made a determination that there was nothing that confined these tollers to working solely with and for the benefit of and to be controlled by protein. Can I ask you to switch to the other appeal? On the differential pricing analysis? Yes. The issue that I came into the argument most interested in is exactly the one that we heard about, which is the calculation of the pooled standard deviation by simple averaging as opposed to weighted averaging, which on its face raises some questions. Can you talk about what exactly commerce's rationale for that is and why it is sufficient to produce a result as facially odd as this numerical hypothetical that's at page 21 of the gray brief and one of the two red briefs? Yes, Your Honor. Commerce uses a simple average to ensure that the pricing behavior of the two groups, the test group and the comparison group, are weighted equally. To use a weighted average would skew... Right, but also it seems... This is, I guess, part of what I'm feeling frustrated about. To say that commerce does it to weight them equally seems to me simply to use different words to describe what they're doing, not to justify what they're doing. And to use the word skew doesn't tell me what it is that skewing means. Why is in the relevant... For the purposes for which Cohen's D is being used to implement the statutory provision, is it sensible to give equal weight to a two-unit group and a thousand, thousand, yes, thousand-unit or hundred-unit group, I guess? Yes, it is, Your Honor. When you're not analyzing or measuring the pricing within the groups themselves, but comparing the two groups equally. So there are only two groups to compare here, the test group and the comparison group. All the rest, which is all the rest, right? That's correct, Your Honor. That's correct, Your Honor. And by measuring with a simple average, it equally reflects the respondent's pricing behavior for the two groups. So it is the pricing behavior and not the prices themselves that are relevant at this stage of the Cohen's D analysis. And so what that means is if you used a weighted average here, it would result in inappropriately moving the pricing behavior towards whichever group had the larger number within it. Can I ask you? I don't remember. I think maybe P.T.'s brief said this. It makes three different challenges to the methodology, but just focusing on this one. If P.T. were right about this challenge, how would, do we know, how would that affect the ultimate determination of an anti-dumping duty margin here? Does that eliminate it? Does it put them under the de minimis level? Or does that still leave some cognizable more than de minimis anti-dumping duty? I don't know the answer to that, Your Honor. What I will say is that the statute doesn't specify. Well, I think this argument is not a statutory argument. I think this argument is all, this is just unreasonable. The other statutory arguments, which we didn't hear about this morning, perhaps because Apex makes them very difficult, but this is not a statutory argument. This is just, you have not shown why this is, Congress, I think Congress has not explained why this is actually a reasonable way to proceed given the relevant statutory policies. And the explanation is just on, what, 2458 and 59, those two pages of the joint appendix for this, I think. I don't have that one. Well, what I was going to say is that it is within commerce's discretion to determine how to identify significant price differences. And we believe that the use of the simple average is reasonable. Using a weighted average may also be reasonable, Your Honor. But that doesn't detract from the reasonableness of using a simple average. Commerce, again, uses the simple average to ensure that the pricing behavior, the pricing practices of the test and comparison groups are weighted equally. And this is consistent with what and how it uses the differential pricing methodology as it was done in Apex, as well as in several other cases that were decided by the Court of International Trade, affirming, sustaining commerce's use of the practice as well as the simple average. I believe my time is up. Thank you, Your Honor. And for all these reasons, we respectfully request that the court affirm the trial court's decision and sustain commerce's final determination. Thank you. Thank you, Ms. Connor. All right, for rebuttal, how have you organized it? Mr. Gordon, are you next? I believe, yes, Your Honor. Thank you. May it please the court. We'll take up all of our time, I don't think. With respect to the close supplier affiliation issue, it is our position that the record supports one and only one reasonable outcome here based on the substantial record evidence that these tollers should be found to be in a close supplier relationship with PT. It is clear on the record that the Commerce Department applied an incorrect legal standard demanding actual control and essentially a captive producer, not merely a close supplier. Similarly, the lower court affirmed using an incorrect legal standard. Moreover, the government's analysis in the underlying investigation was made on a collective basis. There's no evidence in the record providing any type of an individualized assessment of whether these tollers on their own are individually in a close supplier relationship. And ultimately, the very substantial record evidence, in our opinion, supports a determination that these tollers are in a close supplier relationship requiring reversal by this court. So for these reasons, we respectfully request that the court overturn Commerce's determination and remand with instructions to find these tollers in close supplier relationships. Thank you. Thank you. Mr. Schultz, you say one minute. I have one minute, yep. So I want to answer, Your Honors, first your question about does the... How big a difference it makes. Yeah, so it makes it de minimis. It makes it de minimis if they use a weight average. Did you say that in your brief? Yes. I think, okay. Yeah, we did. I don't know the page off hand, but we said it. So I think what the government kept arguing is about that where we want the pricing practices to be weighted equally. And the question that I kept asking in response to that was why are we weighting them equally? We know what the weight is of each group. We know that in our example, you have 99% of the sales of this condom are occurring within this base group. Why am I not taking that into account if I'm trying to accurately determine whether the price difference between the base group and the test group is in line with the pricing practice overall in that group, or I'm sorry, in that condom. So for example, if you're taking the first quarter, am I over? I think I'm over. Sorry, I can stop there unless you have any questions. Okay. Okay, thank you. I think we have that issue. Thanks. Now, Mr. Marshak, is it your turn or is it over? I'm still not sure what this number is. My time was going to come from the government's time. If the government went 15 minutes, I have no time. If the government has time left over to talk about the affiliation, I have that time. So I have no idea if I have time or not. Okay, thank you. Do I have time? Yes. Okay, I want to talk about affiliation. And Petitioner, Mr. Gordon, is saying that it can only be one reasonable result. We believe he's just asking the court to reweigh the evidence. First, on the legal standard, we believe that the Department of Commerce and the court below use the correct legal standard. They look for potential to control. You see that in their opinion. You look at the factors that they look at. One of the factors they look at, could you go someplace else to anyone at the 136th? Didn't Ms. Cotette run through all of this? Yes, I probably don't have anything new. It would just be an addition because I think the government did a very good job on this case. Okay, I think we have that issue. Thank you. Thank you. Thank you all. The case is taken under submission.